H. KALICAK CONSTRUCTION CO., ET AL, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent H. Kalicak Constr. Co. v. Commissioner
Docket Nos. 5030-81, 5098-81, 25040-81.
United States Tax Court
T.C. Memo 1984-552; 1984 Tax Ct. Memo LEXIS 121; 48 T.C.M. (CCH) 1403; T.C.M. (RIA) 84552; October 16, 1984. Paul K. Voelker, for the respondent. KORNER MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal income taxes against petitioners in these cases, as follows: Taxable year
Petitioners
Docket No.
ended
Deficiency
H. Kalicak
Construction Co.
5030-81 December 31, 1975
$109,627.99
Harold Kalicak
5098-81 December 31, 1975
54,205.98
H. Kalicak
Construction Co.
25040-81
December 31, 1977
70,005.00
After concessions, the issues remaining for our decision in Docket Nos. 5030-81 and 5098-81, are as follows: [2]
*123 I. Docket No. 5030-81 - H. Kalicak Construction Co.
(1) Whether petitioner is entitled to an additional net operating loss carryforward to 1975 in the amount of $31,776.71; (2) whether petitioner is entitled to deductions in 1975 for cost of goods sold in respect of the following: (a) "Cash paid-Heeter" in the amount of $24,605; and (b) "Cash expense - H. Kalicak" in the amount of $32,563.65; and (3) whether petitioner is entitled to an additional deduction in 1975 for legal and accounting expenses in the amount of $15,312.45. II. Docket No. 5098-81 - Harold Kalicak
(1) Whether petitioner realized constructive dividend income in 1975 in respect of the following: (a) "Cash paid - Heeter" in the amount of $12,302.50; (b) "Cash expense -H. Kalicak" in the amount of $29,603.42; and (c) legal and accounting expenses in the amount of $4,554.63; (2) whether, if petitioner realized dividend income in respect of any of the foregoing items, he is entitled to corresponding deductions under section 162(a); [3] and (3) whether petitioner is entitled to an exemption from taxation in 1975 in respect of income earned abroad by his now deceased wife, Dorothy, *124 in the amount of $25,000. FINDINGS OF FACT H. Kalicak Construction Co. (hereinafter referred to as "HKCC"), petitioner in Docket No. 5030-81, is a Missouri corporation with its principal place of business at 1982 Congressional Drive, St. Louis County, Missouri, which filed corporate income tax returns (Forms 1120) for the years 1971 through 1975, inclusive. Harold Kalicak (hereinafter referred to as "Harold"), petitioner in Docket No. 5098-81, is an individual whose legal residence is St. Louis County, Missouri and who filed a joint U.S. individual income tax return for the year 1975 with his wife Dorothy, who is now deceased. Harold and Dorothy have two children, Ronald and Steven, who were of the respective ages at the time of trial of 38 and 28. HKCC was formed in or about 1965. Between 1971-1975, inclusive, Harold was the president of HKCC and owned between 51 percent and 89 percent of its stock. During the same *125 period, Thomas Heeter (hereinafter referred to as "Thomas") was a vice-president of HKCC, and owned 11 percent of its stock. From its inception in 1965 through 1975, HKCC was involved in construction work within the United States, including bridge and building construction and renovation work. Beginning in early 1970, Harold and Dorothy moved to and made their principal residence in West Africa. Harold remained in Africa until 1981, residing in the Republic of Zaire until 1976, and Dorothy generally remained there until April 1976. From 1970-1976, Steven lived in Zaire from time to time, when he was not attending school in the United States. From 1970-1973, Ronald also lived in Zaire from time to time, but during late 1974 and 1975, Ronald and his wife lived most of the time in Zaire. During the period of his residence inAfrica, Harold formed several foreign corporations in West Africa, including corporations in the Republics of Zaire, Gabon and Cameroon. These foreign corporations were assisted by HKCC, which supplied them with manpower, construction equipment, materials and insurance, in return for which HKCC received payment together with a service fee. In 1970, *126 Harold formed a corporation in Kinshasa, Zaire, known as Kalicak International RDZ (hereinafter referred to as "RDZ"). RDZ was nationalized by the government of Zaire in 1973. During the period 1970-1975, HKCC had a business relationship with RDZ, whereby the former would assist the latter in its construction work by supplying manpower, equipment and materials. HKCC would recruit and hire American personnel to work for RDZ overseas, and would purchase construction equipment and materials and arrange for their shipment to Zaire. During the same period, Harold worked for both HKCC and RDZ, making sure that HKCC met the service requirement of RDZ, and procuring and supervising RDZ's construction jobs in Zaire. Harold spent approximately 60 percent of his working time on RDZ work and 40 percent on HKCC work, but was compensated, at a salary which he determined, solely by HKCC. In September of 1975, two cashier's checks were drawn by HKCC upon the Hampton Bank, payable to the order of Harold. Both such checks were deposited into Harold's personal bank account. During the foregoing period, living conditions in Zaire were variously described as ranging from "not too bad" *127 to "miserable." There were, in any event, periodic absences of electricity and certain basic food products, it was consistently hot, and it was necessary to boil, filter and maintain one's own supply of water. At all times here pertinent, Harold's son, Ronald, was employed as a vice-president of HKCC. During 1974, while he was working for HKCC in St. Louis, Ronald served as a liason between HKCC and RDZ. After his move to Africa in 1974, Ronald worked for RDZ in Zaire. In March of 1970, Harold hired a Greek national named Dimitri Kitsonidis to serve as business manager of RDZ. In this capacity, Kitsonidis managed payrolls, banking and miscellaneous office administration work. Kitsonidis was compensated by RDZ at an annual rate, as determined by Harold, which rose to the level of $50,000-$60,000, in American dollars, during his later years with RDZ. In addition, he was provided with health insurance and paid vacation leave, and his meals and lodging expenses were paid by RDZ. At an undisclosed time during 1974, Kitsonidis went on a vacation, but he unexpectedly failed to return therefrom to the employ of RDZ. Dorothy began working for RDZ in 1970. However, with the unexpected *128 departure of Kitsonidis, in 1974 and 1975, Dorothy additionally assumed the majority of his duties as the business manager of RDZ. Her responsibilities then included supervising native personnel who were in charge of the staff house used by RDZ to house and feed its employees, purchasing food for such employees, assisting such employees in obtaining health care, arranging for air travel for the American employees to return to the United States, overseeing payrolls and participating in the maintenance of corporate books and records. Dorothy spoke Lingala, the Zairean language, which increased the value of her services to the RDZ operations. Since she and her husband lived in the staff house, together with as many as forty employees, Dorothy had to be prepared to meet her foregoing responsibilities as the need arose, which might be at any time of the day or night. In 1975, Dorothy was paid $25,000 by HKCC; she was never compensated by RDZ, and had not previously been compensated by HKCC. The compensation paid to Dorothy was billed by HKCC to RDZ. On June 15, 1975, Dorothy returned to the United States as a result of ill health. At that time, she was diagnosed as having *129 cancer and was operated upon and hospitalized for several weeks.In July 1975, after her release rom the hospital, Dorothy returned to Africa where she resumed her duties on behalf of RDZ. In April of 1976, Dorothy returned to the United States where she remained until her death on December 15, 1976. On December 28, 1967, Thomas caused to be incorporated in Missouri the Heeter Corporation (hereinafter referred to as "Heeter"), for the purpose of exploiting the North American production and sales rightsto a toy known as the "Ride-A-Roo Kangaroo Jockey Ball." [4] Such rights had been acquired from an English company by means of a contract executed by Harold, who was either the president or vice-president of Heeter. Initially Heeter's board of directors consisted of Thomas, Harold and Don Brown, and its officers included Thomas, Harold, Don Brown and one Leonard Yocum, who was both counsel to Heeter and part-time counsel to HKCC. Harold owned approximately 50 percent of Heeter's stock. Brown, who handled Heeter's *130 marketing and sales, remained with the company up until early 1970, when he resigned.Brown was replaced by an individual who resigned after only two weeks, but such individual was not replaced. The toy, which was originally manufactured in England, consisted of an inflatable round ball with a handle, which was constructed from a rubberized compound, and on which children (or adults) could sit and bounce along the ground. During 1968, Heeter exhibited the toy ball at a toy trade show in New York City where it was favorably received by both potential buyers and distributors and by the press. After the show, Heeter selected approximately seven distributors who would together distribute the toy ball throughout the United States, including Eyerly Associates, Inc. in Chicago, and Julius Levensen, Inc. in New York. Heeter paid its distributors a six percent commission on all sales of the toy balls. Such commissions were paid by Heeter in response to distributor invoices, and such invoices were typically sent to Heeter shortly following sales of the balls at the retail level. During early 1970, Eyerly Associates, Inc. and Julius Levensen, Inc., invoiced Heeter for the following *131 sales commissions: Table 1
Distributor
Date
Amount
Eyerly Associates, Inc.
4/70
$77.75
5/70
353.12
6/70
430.63
Julius Levensen, Inc.
1/70
85.63
2/70
20.31
3/70
252.77
Both Heeter and HKCC used the banking services of Hampton Bank, where Harold dealt most frequently with Marion Hiles, the consumer vice-president who was responsible for bank loans and for the HKCC and Heeter accounts at the bank. Hiles was responsible for making recommendations on bank loans and overdraft advances on behalf of HKCC. Originally, Heeter maintained its own business address. In early 1970, however, Heeter moved into HKCC's business premises in an effort to reduce its expenses. A number of loans were made to Heeter which were ultimately repaid by HKCC. First, in early 1970, Paul Heller, who was the owner of Heller Insurance Co., which provided general insurance for both HKCC and Heeter, loaned HKCC and/or Heeter the sum of $20,000 for the general use of either company. In an undisclosed year which was prior to the year in issue, the proceeds of such loan were applied by HKCC and recorded on its books as an offset to certain personal expenses *132 of Harold. Second, at an undisclosed time, John Frigerio, whose son Al owned Redi-Electric Co., which provided electrical services for HKCC, loaned Heeter the sum of $5,000. On February 24, 1975, this loan was repaid by HKCC. Third, over an undisclosed period of time, Heeter received loans from Carol Heeter (hereinafter referred to as "Carol"), who was Thomas' sister, in the total amount of between $16,000-$17,000. In 1975, HKCC repaid Carol for such loans in the amount, including interest, of $24,605. Heeter also received loans from an individual named Jacob Finke. Such loans were personally guaranteed by Harold and his father, Dorothy, Thomas and his wife, and Don Brown and his wife. In or about October of 1971, Finke, doing business as United Investment Co., sued Heeter as well as each of the foregoing guarantors to collect on Heeter's foregoing indebtedness. In or about September of 1972, Leonard Yocum also sued Heeter as well as Harold, Dorothy and Thomas as statutory trustees of Heeter, to recover allegedly unpaid legal fees. HKCC was not named as a party in either lawsuit. At an undisclosed time, Harold and other representatives of Heeter traveled to Washington, *133 D.C. to discuss with a patent attorney the possibility of patenting the toy ball. They were advised that a number of toy balls which closely resumbled their own product had been produced by other companies in the past, and that it was in any event difficult to protect a patent in the toy business. Acting on such advice, they decided not to seek a patent for the ball. Beginning almost immediately after the end of the New York toy trade show, at least one other company began to manufacture a toy ball to compete with the Heeter product. Despite the competition, sales of the toy ball by Heeter and its distributors were initially excellent. In or about early 1969, however, as a result of a number of production problems, Heeter began to receive consumer complaints and replacement requests from purchasers of the balls. As a result of the first production problem, the toy balls tended to part at the seams, rendering them unuseable. Heeter made efforts to correct this problem, but it subsequently developed that the balls tended to leak air around their inflation valves, also rendering them unuseable. As a result of these product failures together with competition and Heeter's *134 increasing debts, Harold decided during 1970 to terminate Heeter as a business entity, and at an undisclosed point during that year Heeter ceased doing business. For 1969 and 1970, Heeter's corporate income tax returns reflected net operating losses (hereinafter referred to as "NOL's") in the respective amounts of $9,654.75 and $23,918.18. Included among the entries on Heeter's balance sheets, appended to those returns, were the following stated assets and liabilities: Table 2
Beginning of taxable
End of taxable
Year
Year
1969
1970
1970
Assets
Cash
$677.57 (4,824.82)
(7,125.01)
Trade notes and accounts
receivable
89,164.16 210,440.40 71,190.45 Inventories
15,000.00 19,803.84 Total assets
111,695.55 257,510.75 70,350.31 Liabilities and
stockholders' equity
Accounts payable
78,633.78 89,888.85 36,612.09 Mortgages, notes,
bonds payable in
less than 1 yr.
29,610.85 164,060.96 Mortgages, notes,
bonds payable in
1 yr. or more
2,243.33 9,613.02 64,673.68 Retained earnings -
Unappropriated
(4,749.62)
(14,404.37)
(38,322.55)
Total liabilities and
stockholders' equity
111,695.55 257,510.75 70,350.31 *135 In 1969 and 1970, according to Heeter's returns, the company had gross receipts or sales in the respective amounts of $426,132.20 and $19,803.84, returns and allowances in the respective amounts of $51,322.34 and $0, and costs of goods sold in the respective amounts of $278,773.57 and $10,629.81. OPINION I. Docket No. 5030-81 - H. Kalicak Construction Co. Issue (1) - NOL carryforward - $31,776.71
On its Form 1120 for 1975, HKCC claimed an NOL carryforward from its tax years 1966 through 1974 to its tax year 1975, in the amount of $111,878.76, of which respondent allowed $13,081.04, and disallowed the remaining $98,797.72. By mutual agreement of the parties, all of respondent's adjustments with respect to such NOL carryforward have been settled, with the exception of four adjustments to HKCC's income, each of which pertains to HKCC's direct advances to or payments made on behalf of Heeter, as follows: First, HKCC contends that it is entitled to a cost of sales deduction in the amount of $10,312.10, rather than the $8,686.88 allowed by respondent. The difference, in the amount of $1,625.22, is attributable entirely to HKCC's dispute of the disallowance *136 by respondent of an alleged job cost identified as "Job 746 Payments of Heeter Corp. by HKCC." This amount was disallowed by respondent on the basis that it reflected obligations of Heeter which were paid by HKCC. Second, on its 1971 Federal income tax return, HKCC claimed a bad debt deduction for the balance in its account titled "Account Receivable - Heeter Corp." in the amount of $63,848.68, which was computed as follows: Table 3
Year
Purpose
Amount
Debit
Credit
1967
Advances and payments
to or for Heeter
$6,994.67
1968
Advances to Heeter
65,800.00
Payments for Heeter
36,792.53
Charge to Heeter for
overhead costs
36,000.00
Payments by Heeter
to HKCC
116,407.60
1969
Advances to Heeter
12,500.00
Payments for Heeter
3,741.39
Payments by Heeter
to HKCC
3,800.00
1970
Advances to Heeter
14,560.27
Payments for Heeter
7,366.60
1971
Payments for Heeter
300.82
184,056.28
120,207.60
120,207.60
Debits less credits
claimed by HKCC as
bad debt deduction
$63,848.68
Respondent determined that the correct account balance was $64,701.49.Respondent's positive adjustment *137 of $852.81, was attributable to check to Heeter charged to HKCC, which was dated September 12, 1970.Out of the total corrected account balance, respondent allowed a bad debt deduction for HKCC's 1968 charge to Heeter for overhead costs only in the amount of $36,000. HKCC how contends that it is entitled to an additional bad debt deduction of $28,701.49, consisting of $27,848.68 in disallowed payments to and advances for the benefit of Heeter, plus respondent's adjustment to the HKCC account, in the amount of $852.81. Third, respondent disallowed a deduction by HKCC for legal and professional expenses in 1969 in the amount of $700, on the basis that such sum represented expenses of Heeter which were paid by HKCC, rather than expenses of HKCC. HKCC disputes this positive adjustment to its income in its entirety. Fourth, HKCC had claimed legal and professional expenses relative to a number of lawsuits, including one involving Jacob Finke and another involving Leonard Yocum. Respondent disallowed HKCC's expenses relative to these two lawsuits, in the total amount in 1973 of $750, on the grounds that there was no litigation and that the suits originated in claims against *138 Heeter and not against HKCC. HKCC disputes this positive adjustment to its income in its entirety. After concessions, HKCC contends that it is entitled to an additional NOL carryforward in the amount of $31,776.71 (for a total claimed carryforward of $73,525.13), consisting of the sum of the foregoing four items. According to HKCC, the second item described supra, reflecting its unrepaid payments to and for Heeter during the years 1967-1971, in the additional amount of $27,848.68, should be allowable as a business bad debt under section 166. In support of this position, HKCC maintains that such advances and payments constituted bona fide indebtedness of Heeter based upon valid and enforceable obligations to pay to HKCC fixed or determinable sums, which became worthless with the failure of Heeter in mid-1970. In the alternative, and also in sole support of its claimed entitlement to deductions for the foregoing legal and professional and job cost expenses, HKCC maintains that such payments should be allowable under section 162 as ordinary and necessary expenses of its business. This position rests upon HKCC's contentions, first, that because of its close relationship *139 with Heeter, it could have been compelled to pay Heeter's expenses; and second, that in any event it made the subject payments in order to protect its own reputation, goodwill and credit standing. According to respondent, on the other hand, HKCC's subject payments during 1967-1971 cannot constitute business bad debts since Heeter's business was already foundering at the time such payments and advances were made, and HKCC had no reasonable expectation that these sums would be repaid. [5] In opposition to HKCC's contention for deductibility of these payments as well as its legal and professional and job cost expenses under section 162, respondent maintains, first, that these were expenses of Heeter paid by HKCC rather than expenses of HKCC, and second, that there has been no showing that HKCC had any goodwill, reputation or credit standing to protect. Respondent concedes that the disputed amounts were actually paid. *140 We accordingly proceed to a separate consideration of HKCC's claims under sections 166 and 162. (a) Section 166
Section 166 allows as a deduction any debt which becomes worthless within the taxable year. Section 166(a)(1). Section 1.166-1(c), Income Tax Regs. provides, in pertinent part, as follows: Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * For purposes of section 166, "debt" not only involves a legal obligation to pay on the part of the debtor but also involves an expectation of repayment on the part of the creditor. Thus, if the purported debtor is insolvent or is otherwise incapable of paying and the purported creditor does not expect to be repaid, the advance may be deemed to be a gift or a contribution to capital, but it is not a bona fide debt. Reading Co. v. Commissioner,132 F.2d 306, 310 (3d Cir. 1942), cert. denied 318 U.S. 778 (1943); Roussel v. Commissioner,37 T.C. 235, 242 (1961). [6] In inquiring whether *141 HKCC's disputed advances to and payments on behalf of Heeter were intended to be loans, we face an issue which is essentially factual, see C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 656 (1968), remanded in view of a subsequent compromise and settlement 406 F.2d 290 (6th Cir. 1969), and with respect to which HKCC bears the burden of proof.Rule 142(a). The fact that there may be common ownership and control of the putative lender and borrower at the time the loan was made does not preclude the existence of a real debtor-creditor relationship, but we must closely scrutinize the interchange of funds between such related corporations. Kraft Foods Co. v. Commissioner,232 F.2d 118, 123 (2d Cir. 1956), revg. on another issue 21 T.C. 513 (1954); Malone & Hyde, Inc. v. Commissioner,49 T.C. 575, 578 (1968). On this record, we believe that HKCC has met its burden of proving that it reasonably expected that Heeter would repay those payments which it had *142 made to or for Heeter prior to July 1970, but has failed to meet its burden as to the remaining sums in issue. Heeter was formed by Thomas at the end of 1967 for the purpose of exploiting the production and sales rights to the "Kangaroo Jackey Ball." During 1968, the ball was exhibited at a trade show where it was received enthusiastically by buyers and distributors as well as by the press. Initial sales of the ball in 1968 and early 1969 were described as "excellent." At some point after the toy show, however, Heeter was advised not to patent the ball, and other toy manufacturers began to market competitive products. In early 1969, as a result of a series of serious product failures, Heeter began to receive consumer complaints and requests for replacement of the balls. Despite these problems, in 1969 Heeter reported gross sales of $426,132.20 and returns and allowances of only $51,322.34.While it is true that Heeter also reported an excess of liabilities over assets in that year in the amount of $14,404.37, as reflected on Table 2, supra, we believe that such difference, which took account of mortgages, notes and bonds in the total amount of $173,673.98, included HKCC's unrepaid *143 payments and advances to Heeter in that year in the amount of $5,620.99. Over the course of 1970, Heeter's problems with product failures, consumer complaints and competition worsened, and Don Brown, who directed Heeter's marketing and sales operations, departed the company. Brown's replacement remained with Heeter for only several weeks, and he was not replaced at all. In 1970, Heeter reported gross sales of $19,803.84, with no returns and allowances. Heeter's balance sheet for that year reflected an excess of liabilities over assets in the amount of $38,322.55, but we once again believe that this difference, which took account of mortgages, notes and bonds in the total amount of $64,673.68, included HKCC's unrepaid payments and advances to Heeter in that year in the amount of $21,926.87. Table 3, supra, reflects that during 1967, which was Heeter's first year of business, HKCC's payments to or for it totalled $6,994.67 (exclusive of the overhead charges allowed by respondent as a bad debt), and Heeter made no repayments. In 1968, HKCC's payments to or for Heeter totalled $102,592.53, and Heeter repaid the entirety of the 1967 and 1968 payments plus an additional *144 sum of $6,820.40. In 1969, HKCC's payments totalled $16,241.39, and Heeter repaid $3,800. Finally, HKCC's payments to or for Heeter totalled $21,926.87 and $300.82 in 1970 and 1971, respectively, and Heeter made no repayments. Thus, of HKCC's payments to or for Heeter through 1971, Heeter repaid 100 percent for 1967, 100 percent for 1968, 65 percent for 1969 (taking account of the $6,820.40 credit from 1968), and 0 percent for 1970 and 1971. This record thus reflects that Heeter was a promising new company which got off to a fast start in 1967 and 1968. Through 1969 and at least part of 1970, Heeter experienced significant sales of its toy balls, and had a balance sheet which reflected, exclusive of the payments which are here in issue, a relatively small excess of liabilities over assets. These facts, taken together with Heeter's consistent history of substantial repayments, [7] are persuasive evidence that HKCC made its payments to or for Heeter, through at least a portion of 1970, with an intention to establish an enforceable obligation and with a reasonable expectation of repayment. Consistent with this intention, HKCC entered the payments on its books as accounts *145 receivable from Heeter. At some point during 1970, however, Harold determined to terminate Heeter as a business entity. Harold described his reasons for this decision as follows: Well, the -- the predominance of failure of the product and the resultant requests by the distributors for the -- for the refunding of the monies became extremely high until the volume of dollars -- it was evident to me that our limited funding would not permit us to try to manufacture the ball's great expense [sic] and at the same time try to pay the debts for the Heeter Corporation * * * that were now surfacing. While not free from doubt, we believe that the evidence herein supports the conclusions that it was not until July 1970 that the salesof the "Kangaroo Jockey Ball," and hence the financial prospects of Heeter, really lost their bounce. Thus, as we have found, at least two of Heeter's seven distributors were invoicing the company for sales commissions through the first six months of 1970. Since those invoices were sent shortly after the retail sales on which they were based, they reflect significant *146 and indeed generally increasing retail sales over the course of that period. However, there is no evidence that any invoices were received for such sales commissions after June 1970. We therefore believe that HKCC reasonably expected that Heeter would repay those payment made to it up to July of 1970. As apparently conceded by HKCC, however, to the extent that any payments were made by HKCC to or for Heeter in or after July of 1970, Heeter's abrupt sales decline and worsening financial condition made the expectation of repayment unlikely. [8] It remains for us to determine whether HKCC has met its burden of proving the extent, if any, to which its unrepaid payments to Heeter in 1970 in the total amount of $21,926.87, were allocable to the first half of that year. The sole evidence offered on this point was a joint exhibit of the parties consisting of copies of the workpapers of the examining revenue agent. At trial, respondent indicated that this exhibit was intended to show "what the [HKCC] books reflected as far as the loans and repayments beginning in 1967 and also any journal entries *147 that were made to show how the company's books arrived at the amount of bad debt claimed on the return." Respondent does not contest the fact that the payments described on the exhibit were made. Such exhibit reflects a number of dated entries and descriptive remarks in HKCC's "Account Receivable - Heeter Corp." account during the first half of 1970, including entries for "cash paid" to Heeter and "expenses paid" for Heeter, which total $9,609.60 through the end of June 1970. [9]
Exercising our best judgment in light of all the evidence, Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and revg. in part 11 B.T.A. 743 (1928), we are persuaded that HKCC paid the foregoing sum of $9,609.60 to or for Heeter with a reasonable expectation of repayment. Such payments therefore constituted bona fide debts within the meaning of section 166. Payments attributed to the second half of 1970, in the amount of $12,317.27, and the 1971 payment in the amount of $300.82, however, were *148 made by HKCC at a time when Heeter's impending failure and/or actual termination was manifest and, as to those payments, we conclude that HKCC had no reasonable expectation of repayment.[10]
(b) Section 162
We turn next to HKCC's contentions for deductibility of the remaining payments as ordinary and necessary expenses of its business under section 162. Section 162 allows as a deduction all the ordinary and necessary expenses paid or incurred by a taxpayer during its taxable year in carrying on a trade or business. Generally, payment by one taxpayer of the obligation of another taxpayer is not *149 ordinary and necessary. "Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily." Welch v. Helvering,290 U.S. 111, 114 (1933). See also Deputy v. DuPont,308 U.S. 488 (1940). While the subject payments were made by HKCC to or for the benefit of Heeter, which was a separate corporate taxpayer, HKCC advances two theories in an attempt to establish that such payments were ordinary and necessary to its own business. First, according to HKCC, the subject payments are deductible by it under section 162 since it could have been compelled to pay the valid debts of Heeter. Second, HKCC asserts that it made the subject payments to and for the benefit of Heeter in order to protect its own goodwill, reputation and credit standing. We note initially that HKCC has offered no evidence to explain or to support its claim for the deductibility under section 162 of the subject 1969 payment for legal and professional expenses or the 1971 payment for a job cost expense. We therefore sustain respondent's determination as to these *150 items, and proceed to a consideration of the deductibility of the 1973 legal and professional expenses and to that portion of the 1970-1971 payments which we have already disallowed as bona fide indebtedness, in light of HKCC's foregoing contentions. There is no contention herein that HKCC guaranteed or was otherwise contractually obligated to pay any of the subject obligations of Heeter.Nonetheless, HKCC contends that it could have been compelled to pay such obligations on one of two basic theories. First, according to HKCC, "a creditor owed money by [Heeter] would attempt to pierce the corporate veil and most likely that action would lead to a suit against [HKCC]." While it is true that under Missouri law a corporate veil may be pierced by creditors, such piercing typically reaches the shareholders of that corporation, and not a separate non-shareholder corporation. See Fairbanks v. Chambers,665 S.W.2d 33 (Mo. Ct. App. 1984). Furthermore, in determining whether to pierce the corporate veil, the Missouri courts inquire whether the corporation was used as a subterfuge to defeat public convenience, to justify wrong or to perpetuate fraud, and the *151 corporate entity is not disregarded where to do so would promote an injustice or contravene public policy. Fairbanks v. Chambers,supra at 37; Sampson Distributing Co. v. Cherry,346 Mo. 885, 143 S.W.2d 307, 309 (1940). HKCC does not contend herein that Heeter was used for such an improper purpose and there is nothing in the record that would support any such contention. Second, in support of its contention that Heeter's creditors would look beyond that corporation to HKCC for payment, HKCC alleges that Heeter's failure to adhere to certain corporate formalities raised questions about its corporate existence under state law. In particular, according to HKCC, Heeter failed to issue stock certificates and neither Harold nor Thomas paid for their ownership interests in the corporation. Since there was also a free interchange of funds between HKCC and Heeter, and since HKCC and Heeter shared employees and offices and used the same bank, according to HKCC, "any expense of the Heeter Corporation would obviously be an expense of HKCC." Included in this record as a joint exhibit of the parties is a certified copy of Heeter's certificate of incorporation *152 and articles of incorporation, authorizing the company to issue 200,000 shares of common stock of the par value of $1.00 per share, of which 1,000 shares were to be issued before the company commenced business. According to the articles of incorporation, "the corporation will not commence business until consideration of the value of at least One Thousand Dollars ($1,000.00) has been received for the issuance of the shares." Also included in the record as a joint exhibit is an authentication of Heeter's records, signed by both Thomas and Harold on December 28, 1967, as directors of "a corporation duly organized and existing under the laws of the State of Missouri * * *." While it is true that neither Harold nor Thomas recalled at trial paying for their ownership interests in Heeter, Heeter's income tax returns for 1969 and 1970 reflect that Harold and Thomas were the sole shareholders of the corporation and that $2,000 was paid in for the common stock of the corporation. There is also no evidence to persuade us that Heeter failed to issue stock certificates. As to this issue, the testimony of both Harold and Thomas was vague and uncertain.Furthermore, contrary to HKCC's *153 suggestion, neither the interchange of funds between HKCC and Heeter nor the commonness of the employees, offices or bank employed by the two corporations, would justify disregarding the corporate entity of Heeter in favor of HKCC. See Dodd v. Commissioner,298 F.2d 570, 578 (4th Cir. 1962), affg. a Memorandum Opinion of this Court. Finally, even if it were shown that Heeter was formed or operated in a defective manner, HKCC has failed to show how it, rather than Heeter or Harold and Thomas, would be held responsible for Heeter's financial obligations. HKCC next contends that it made the subject payments in order to protect its own goodwill, reputation and credit standing. In so contending, HKCC apparently relies upon an exception to the general rule - that payment by one taxpayer of the debts of another is not ordinary and necessary - which holds that such a payment may qualify under section 162 where it was made to protect or promote the payor's business. Lohrke v. Commissioner,48 T.C. 679, 684-685 (1967); Pepper v. Commissioner,36 T.C. 886 (1961). To qualify under this exception, HKCC must show both that it was *154 motivated by protection of its own ongoing business, and also that its payments were appropriate to the furtherance or promotion of that business. Lohrke v. Commissioner,supra at 688; Rushing v. Commissioner,58 T.C. 996, 1003 (1972). Marion Hiles, an officer of Hampton Bank who was responsible for loans made by the bank to HKCC and Heeter, testified repeatedly and definitively that the bankruptcy of Heeter would have had no effect on HKCC's credit standing with the bank. It is true that Hiles, when further asked whether HKCC's creditworthiness might have been impaired by a substantial number of lawsuits brought against it by unsatisfied creditors of Heeter for substantial sums of money, responded in the affirmative. There is no evidence, however, that any such creditors would have, or indeed could have, sought payment of Heeter's debts by HKCC. As we have found, the record discloses that only two of Heeter's alleged creditors, Jacob Finke and Leonard Yocum, instituted collection actions against the company. While Harold and Thomas, inter alia, were named as co-defendants in such actions, neither plaintiff sought to collect *155 from HKCC. As to HKCC's payments to other creditors and/or clients of Heeter, HKCC has persuaded us neither that it ever borrowed money from or did business with such creditors and/or clients, nor that any person or entity from whom it borrowed money or with whom it did business would be aware of or affected by Heeter's defaults. We therefore cannot find that HKCC has met its burden of proving the requisite nexus between its payments to or for Heeter and its own corporate weal. While the motivation of HKCC for making such payments is not clearly disclosed on this record, we believe that it is probable that the payments, at least to the extent that they preceded the ultimate termination of Heeter as a business entity, were made in an effort to resuscitate its failing business fortunes. Support for the conclusion that it was the regular business practice of each corporation to financially assist the other in this manner is found in Harold's following testimony in response to a question concerning his procedure for depositing Carol Heeter's loans to Heeter: * * * both corporations as you can well see assisted each other from time to time * * * whichever one had the most resources *156 would assist the other company.And it wouldn't have made any difference to me if the check was made out to [HKCC] [sic] I would have probably put it in that account. And then if the other corporation needed assistance, we'd issue a check and probably mark it down as a loan. [Emphasis added.] As to thelegal and professional payments made by HKCC relative to the Finke and Yocum lawsuits in 1973, HKCC was not named as a party defendant in either such action, but Harold and Thomas together with Heeter, inter alia, were so named in both. In the Yocum action, Harold and Thomas were named as statutory trustees of Heeter. Under Missouri law, statutory trustees of a corporation are "jointly and severally responsible to the creditors and shareholders of the corporation to the extent of its property and effects that shall have come into their hands." Mo. Ann. Stat. sec. 351.525 (Vernon 1966-Supp. 1984).In the Finke action, Harold and Thomas were named as personal guarantors of Heeter's alleged debt to the plaintiff. There is no evidence that either lawsuit resulted from some action of HKCC relative to its ordinary business. There is also no persuasive evidence that *157 the results of either lawsuit would have had any adverse impact upon the reputation of HKCC, as distinguished from the reputations of its and Heeter's principal shareholders, Harold and Thomas. [11]
Issue (2) - Cost of goods sold
On its Form 1120 for 1975, HKCC claimed a current deduction for the cost of goods sold in the amount of $745,946.50, including an item described as "Misc. job cost." The amount shown on HKCC's return for "Misc. job cost" was computed *158 from balances in various expense accounts maintained in HKCC's books, including the following: Table 4
Account No.
Account title
Amount in issue
612
Cash paid - Heeter
$24,605.00
613
Cash expense - H. Kalicak
32,563.65
Total:
$57,168.65
HKCC's account number 612, titled "Cash paid - Heeter" consists of a single check drawn by HKCC upon Hampton Bank, payable to the order of Thomas' sister, "Carol Heeter." Such check, in the amount of $24,605, represents HKCC's repayment of Carol's loans to Heeter, described supra, together with interest. As to HKCC's account number 613, on its 1975 return, HKCC deducted as "Cash expense - H. Kalicak" the debit balance in its account titled "Loans receivable - H. Kalicak" in the amount of $34,928.88. Of this amount, respondent allowed $2,365.23 and disallowed the balance, or $32,563.65. The debit balance in the loan account, claimed as a deduction, is comprised of a number of debits and credits, including the following: Table5
Check No.
Date
Payee
Amount
(1) -
"Paul Heller"
$20,000.00
(2) -
"Hampton Bank"
.40
(3) 7488
2/24/75
"John Frigerio"
5,000.00
(4) -
6/24/75
"Cashier's Check"
7,000.00
(5) -
6/16/75
"Cashier's Check"
3,000.00
Total: $35,000.40
*159 The first of the foregoing debit entries, reflecting "Paul Heller' as payee, relates to Heller's loan to HKCC, described supra, which was in an undisclosed prior year applied by HKCC and recorded on its books as an offset to certain personal expenses of Harold. Since HKCC concedes on brief the nondeductibility to HKCC of the $20,000 Heller entry, contending as the basis therefor that such entry actually reflected HKCC's repayment of the Heller loan in 1975, such entry is no longer in issue as to the corporation (but remains in issue in Docket No. 5098-81, discussed infra). The Frigerio check, which is the third entry on Table 5, is marked with the legend "repayment of loan," and was issued by HKCC in repayment of John Frigerio's loan to Heeter, described supra.
The fourth and fifth entries on Table 5 reflect two cashier's checks, drawn by HKCC upon Hampton Bank on the dates shown, payable to the order of Harold, which were deposited into Harold's personal bank account. Harold had no recollection as to why such checks were entered into the "Cash expense - H. Kalicak" account. (a) "Cash paid - Heeter"- $24,605
As to the subject payment by HKCC on *160 behalf of Heeter, HKCC claims that "it is incumbent upon [HKCC] to pay these creditors, including Carol Heeter, to avoid a suit piercing the Heeter corporate veil and attacking [HKCC]." For the same reasons which we have explained under Issue (1) (b), supra, we reject this argument. Furthermore, to the extent that HKCC's arguments concerning protection of its goodwill and credit standing might extend to its repayment of Carol's loan to Heeter, HKCC has shown neither that it ever borrowed money from or did business with Carol, nor that any person or entity from whom it borrowed money or with whom it did business would be aware of Carol's loan or of the fact that she was not repaid by Heeter. We accordingly sustain respondent's disallowance of the subject deduction. (b) "Cash expense - H. Kalicak" - $32,563.65
The third entry reflected on Table 5, according to HKCC, is deductible as an ordinary and necessary business expense of HKCC for the same reasons advanced by the corporation with respect to Issue (1), supra. For the same reasons discussed relative to the prior issue, however, we believe that HKCC has failed to show that it could have been compelled to pay *161 this Heeter debt. Furthermore, to the extent that HKCC's arguments concerning protection of its goodwill and credit standing might extend to its repayment of Frigerio's loan to Heeter, HKCC has shown neither that it borrowed money from Frigerio, nor that any person or entity from whom it borrowed money or with whom it did business would be aware of Frigerio's loan or of the fact that he was not repaid by Heeter. [12]
The fourth and fifth entries on Table 5, according to HKCC, reflect cashier's checks which were used to pay expenses of the overseas company, RDZ, while Harold was in Africa, and are deductible by HKCC as an ordinary and necessary expense of its construction business. At trial, Harold had no recollection as to why these checks were entered into the subject account. In support of its contention for deductibility *162 of the payments, HKCC relies solely upon the testimony of Ronald Kalicak, who explained such payments as follows: Are you -- let's see, in -- in June of '75 there was a -- was a lot going on. My mom was -- my mom was dying at the time and I believe she had come back to St. Louis. At about that same time I think that Laura Squires and her husband had visited us in -- in Kinshasa. And I think Dad was -- was in Kinshasa also during most of June anyway. And my wife and my children were there. And it seemed to me that the -- this -- Zaire was having the horrible fluctuation at the time, the currency of Zaire. And we were having difficulty of using [sic] the tickets that we had over there * * * because the travel agencies weren't honoring them unless you paid * * * dollars or some other hard currency. * * * [S]omething tells me that * * * there was a need to get some physical, hard currency overseas about that time for -- for some tickets. Now how we did that at the time I don't know. It could have been done by some sort of a -- of a cashier's check, but it would have had to have been smaller amounts and * * * I think that there were travelers [sic] checks *163 brought over and I think they were brought over by Laura. They could have been brought back over by my mother * * * [or] by Harold Kalicak. All right around * * * the 4th of July * * * in 1975. And I'm, very vague about that. [Emphasis added.] Ronald's foregoing testimony falls far short of meeting HKCC's burden of proving either that the subject cashier's checks were issued for the above-described purpose, or that such purpose would in any event constitute an ordinary and necessary business expense of HKCC. As to the second item reflected on Table 5, HKCC contends for the first time on brief that such item constitutes a "deductible banking charge." HKCC has offered no proof as to the nature of this alleged $ .40 charge, however, and has therefore failed to meet its burden as to this item. Issue (3) - Legal and accounting expenses - $15,312.45
On its Form 1120 for 1975, HKCC claimed a deduction for legal and accounting expenses in the amount of $41,851.48, of which respondent disallowed $15,312.45, on the basis that "it has not been established that any amount more than $26,539.03 was for an ordinary and necessary business expense within the meaning of *164 section 162 * * * or was expended for the purpose designated." HKCC has offered no proof in support of this claimed deduction and has apparently not addressed it on brief. Accordingly, we sustain respondent on this issue. [13]
II. Dlcket No. 5098-81 - Harold Kalicak Issue (1) - Dividend income[14]
*165 Respondent determined that HKCC's majority shareholder, Harold, realized additional lividend income in 1975 in the total amount of $46,460.55, in respect of several payments and account entries made by the corporation, as follows: (a) As to HKCC's repayment in 1975 of Carol Heeter's loan to Heeter in the amount of $24,605, as reflected in HKCC's "Cash paid - Heeter" account, respondent determined that Harold had received a constructive dividend from HKCC in that year in the amount of $12,302.50; (b) as to HKCC's journal entry respecting the loan from Paul Heller, in the amount of $20,000, and HKCC's payments to the order of Harold of two cashier's checks, in the total amount of $10,000, as reflected in Table 5, supra, respondent determined that Harold had realized a constructive dividend in that year in the amount of $29,603.42; and (c) as to HKCC's claimed legal and accounting expenses in 1975 in the amount of $41,851.48, respondent determined that Harold and Thomas each received constructive dividends from HKCC in that year in the amount of one-half of the $15,312.45 disallowed at the corporate level, or $7,656.23, of which only $4,554.63 remains here in dispute. *166 It is well established that a corporate distribution to a third party for the benefit of a shareholder constitutes a constructive dividend, which will be taxed as a dividend to the shareholder for whose benefit the distribution is made. Equitable Publishing Co. v. Commissioner,356 F.2d 514 (3d Cir. 1966), affg. per curiam a Memorandum Opinion of this Court, cert. denied 385 U.S. 822 (1966); Sachs v. Commissioner,277 F.2d 879, 882 (8th Cir. 1960), affg. 32 T.C. 815 (1959), cert. denied 364 U.S. 833 (1960); Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980); Magnon v. Commissioner,73 T.C. 980, 997 (1980). The benefit conferred by such a distribution may be merely the pursuit of a hobby, the fulfillment of a moral obligation, or the making of a gift; and need not be of a direct financial nature. W.D. Gale, Inc. v. Commissioner,297 F.2d 270, 271 (6th Cir. 1961), affg. a Memorandum Opinion of this Court; Byers v. Commissioner,199 F.2d 273, 275 (8th Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 345 U.S. 907 (1953). *167 The essence of a constructive dividend is the distribution of corporate earnings for some private purpose of a shareholder. Cf. Helvering v. Horst,311 U.S. 112 (1940). However, a constructive dividend will not be found where the benefit received by the shareholder from the transfer is indirect or derivative, as opposed to direct or tangible. Gilbert v. Commissioner,74 T.C. 60, 64 (1980). The issue of benefit to the shareholder is an issue of fact, as to which the burden lies with petitioner. Gilbert v. Commissioner,supra; Rule 142(a). In light of these general legal principles, we turn to a separate consideration of each of the alleged constructive dividend items in issue. (a) "Cash paid - Heeter" - $12,302.50
During 1975, HKCC paid Carol the sum of $24,605 in repayment of a loan which Carol had made to Heeter. There is no contention herein that Harold had personally guaranteed repayment of such loan to Carol. Rather, respondent finds a "personal responsibility" on Harold's part grounded in his moral obligation to repay Carol. Thus, according to respondent, Harold benefitted personally from HKCC's repayment, and *168 it was therefore taxable to him as a constructive dividend. As we have found with respect to the corporation, supra,HKCC has failed to demonstrate any business purpose for its payment of $24,605 to Carol some five years after cessation of the business of the related obligor corporation. While the absence of such a business purpose is not necessarily determinative that a constructive dividend occurred, Gilbert v. Commissioner,supra at 67, other facts herein persuade us of the correctness of that conclusion in this instance. The record reflects that Harold and Thomas were close business associates in both the HKCC and Heeter enterprises, and that Carol was Thomas' sister. While there is no evidence of an explicit guarantee of Carol's loan to Heeter, we believe that it is reasonable to infer, particularly in the absence of any alternative explanation, that Carol's brother, Thomas, and his business associate, Harold, would feel at least an implicit moral obligation to repay her advance to Heeter. Consistent with this inference, we find it significant that Harold testified that it a business acquaintance or friend, including Carol, loaned money *169 to a corporation in which he had an interest, he would if necessary repay such individual out of his own pocket. We are convinced, therefore, that HKCC's corporate distribution to Carol resulted, not form the exigencies of its construction business, but from the private purposes of its shareholders, Harold and Thomas. The distribution thus resulted in a constructive dividend to Harold. (b) "Cash expense - H. Kalicak" - $29,603.42
As reflected in Table 5, supra, included in HKCC's "Loans receivable - H. Kalicak" account, from which the subject expense account derived, were entries: (1) In respect of a loan from Paul Heller in the amount of $20,000; and (2)reflecting two cashier's checks drawn by HKCC upon Hampton Bank to the order of Harold, in the total amount of $10,000. As we have found, the balance in such account, including the foregoing amounts, was expensed on HKCC's corporate return for 1975 as a cost of goods sold. According to respondent, the foregoing entries in Harold's loan account represent amounts paid by HKCC for his benefit or loans made to him by the corporation, which were cancelled in 1975, resulting in his realization of income therefrom *170 in that year. According to Harold, on the other hand, the subject account was really a "suspense account," into which were temporarily entered items the classification of which was uncertain, and with respect to which all items of personal benefit to Harold were repaid by him to the corporation. We agree with respondent that the two cashier's checks, which were purchased with corporate funds and deposited into Harold's personal account, were clearly income to Harold. Harold had offered no persuasive evidence to show that such funds were expended for a business purpose of HKCC (as discussed in section I (2)(b), supra) or for other than his own personal purposes. In contending that "No proof was offered by the government that any of the money was used for Harold Kalicak's benefit," petitioner apparently misunderstands that it is he who bears the burden of overcoming respondent's determination that the funds were so used; a burden which he has clearly failed to meet. As to the $20,000 account entry with respect to the Heller loan to HKCC, respondent maintains that Harold has failed to show that such funds were expended for other than his personal purposes or that *171 they were other than loans to him which were cancelled by HKCC in 1975. According to Harold, the subject entry simply reflects HKCC's repayment in 1975 of Heller's loan to it. We agree with respondent. It is clear that where a shareholder borrows money from a corporation, a cancellation of the shareholder's indebtedness constitutes dividend income to him. Shephard v. Commissioner,340 F.2d 27 (6th Cir. 1965), affg. a Memorandum Opinion of this Court, cert. denied 382 U.S. 813 (1965); Hash v. Commissioner,273 F.2d 248 (4th Cir. 1959), affg. a Memorandum Opinion of this Court; Wiese v. Commissioner,93 F.2d 921 (8th Cir. 1938), affg. 35 B.T.A. 701 (1937), cert. denied 304 U.S. 563 (1938); Hudson v. Commissioner,99 F.2d 630 (6th Cir. 1938), affg. 34 B.T.A. 155 (1936), cert. denied 306 U.S. 644 (1939). See also section 1.301-1(m), Income Tax Regs. This taxable result remains the same regardless of whether formal corporate resolutions are adopted or the cancellation of indebtedness is effected by book entries on the corporate records. "The distinction *172 is not important. The result is the same whichever method be applied." Wiese v. Commissioner,supra at 922. See also Shephard v. Commissioner,supra.
On the strength of the consistent and unrefuted testimony of respondent's revenue agent, who examined the returns of HKCC and Harold for the years in issue, we have found that HKCC applied the full proceeds of Heller's loan to it, in the amount of $20,000, to offset personal expenses of Harold in an undisclosed year which was prior to 1975. In contrast, when asked what the loan was used for, Harold testified only in general terms that it was "to help conduct business in both corporations," and he stated that he had no recollection as to how or why it had been entered into a corporate loan account bearing his name. At the same time, Harold's testimony suggests that it was not unusual for him to write checks on HKCC's account for his personal purposes, and that such checks would be recorded on the books of HKCC in an appropriate account. Similarly, Ronald testified that he wrote checks on HKCC's account for his personal purposes, and that such checks would be entered into HKCC's *173 account for loans receivable from "R. Kalicak," indicating to him that "I've got to pay tax on it or -- or I've got to pay it back in the form of a loan." On this record, we believe that the most plausible explanation for the Heller entry is that HKCC, having applied the proceeds of the loan to Harold's personal benefit, expected that Harold would restore such proceeds at some future date. When HKCC expensed the "Loans receivable - H. Kalicak" account in 1975, it cancelled Harold's subject indebtedness to it, which was included within such account, resulting in Harold's realization of a constructive dividend pursuant to the foregoing legal authorities. Harold maintains that the subject entry actually reflected HKCC's repayment of the Heller loan in 1975 by check, and that the "Loans receivable - H. Kalicak" account was really a suspense account which included items which were not loans to him, and which "was labeled by the corprate accountant without Harold's knowledge." There is no evidence, however, that the $20,000 entry represented HKCC's issuance of a check, or that the Heller loan was repaid in 1975 at all. Harold could not recall when such loan was repaid by *174 the corporation, but acknowledged that it may have been as late as in 1977. Furthermore, in view of the testimony of Harold's son, Ronald, that he periodically received accounting summaries, including (on at least an annual basis) an itemization of accounts from HKCC's accountant, Al Gorman, we find Harold's professed naivete concerning the nature of the corporation's accounts to be disingenuous. Contrary to Harold's contentions, we therefore conclude that this is a case where petitioner has failed to show "that the transaction in issue was not in fact exactly what the book entry showed it to be." Hash v. Commissioner,supra at 251. (c) Legal and accounting expenses - $4,554.63
In support of his position that this amount did not constitute a constructive dividend to him, Harold argues that HKCC, rather than he, primarily benefitted from the subject payments. In so contending, Harold rests upon the same arguments which were raised by HKCC at the corporate level. However, in disallowing the subject expenses at the corporate level in section I (3), supra, we held that HKCC had failed to prove that the Finke or Yocum lawsuits resulted from *175 some action of HKCC relative to its ordinary business or that the results of either lawsuit would have adversely affected its corporate reputation, as distinguished from the personal reputations of its principal shareholders, Harold and Thomas. As we have found, Harold was named as a defendant in the Finke action as a personal guarantor of Heeter's purported debt to the plaintiffs therein, and in the Yocum action in his capacity as a statutory trustee of Heeter. HKCC was not named as a party in either action. While Heeter was named as a party defendant in both actions, the corporation had ceased doing business several years earlier. Under Missouri law, statutory trustees of a corporation are jointly and severally responsible to creditors of the corporation to the extent of any of its property and effects which have come into their hands. Mo. Ann. Stat. sec. 351.525 (Vernon 1966 - Supp. 1984). It is evident that the primary and direct consideration in HKCC's payment of the subject legal expenses relative to the Finke action was the personal liability of Harold. While Harold was a defendant in the Yocum action solely in his capacity as a statutory trustee of Heeter, he has failed *176 to prove that he had no personal liability in such capacity under Missouri law. See Mitchell v. Director of Revenue,619 S.W.2d 352, 353 (Mo. App. 1981). We therefore conclude that HKCC made the subject payments, not for its own business purposes, but for the direct and primary benefit of its controlling shareholder, Harold, who has adduced no evidence to persuade us to the contrary. The payments therefore constituted constructive dividends to Harold in 1975. See Jack's Maintenance Contractors, Inc. v. Commissioner,703 F.2d 154, 156 (5th Cir. 1983), revg. per curiam on another issue a Memorandum Opinion of this Court. [15]
Issue (2) - Business expense deductions
Harold contends that if he is found to have realized constructive dividends by reason of payments and/or the cancellation of loans by HKCC which we have discussed in section II (1), supra, then he is entitled to "constructive deductions offsetting any income realized." Citing solely a Memorandum Opinion of this Court, Jenkins v. Commissioner,T.C. Memo. 1983-667, *177 Harold argues that he is entitled to deduct the foregoing amounts since they were expended to protect his own "business reputation." In Jenkins v. Commissioner,supra, citing the general rule that a shareholder may not deduct a payment made on behalf of the corporation but rather must treat it as a capital expenditure, we nonetheless found deductible as ordinary and necessary expenses of the taxpayer's business as a country music performer, certain payments made by him to investorsin a defunct restaurant business which bore his professional name, Conway Twitty. Crucial to our holding in that case were a number of "unique circumstances" supporting our finding of "a proximate relationship between the payments made to the holders of the Twitty Burger debentures and petitioner's trade or business as a country music entertainer * * *." Jenkins v. Commissioner,supra.
We have found that HKCC made the subject payment to Carol in 1975 as a result of the moral obligation of its controlling shareholder. It is clear that a shareholder payment which is motivated by such personal considerations will not qualify for deductibility under the *178 rationale applied in Jenkins.[16]
We have also found that the subject debit entries into the "Loans receivable - H. Kalicak" account as well as the subject payments for legal and accounting expenses reflected direct payments or loans cancelled by HKCC for the personal benefit of Harold. We are unable to discern with respect to any of such entries or payments the proximate relationship with any business of Harold's which might justify his deduction of the subject amounts in accordance with our holding in Jenkins. Cf. Lohrke v. Commissioner,supra at 688. Issue (3) - Exemption of income earned abroad
On their joint Form 1040 for 1975, Harold and Dorothy claimed exemptions of income earned abroad under section 911 [17] includingwages of $25,000 allegedly earned by Dorothy pursuant to her employment with RDZ in Zaire, Africa.Respondent disallowed exclusion of this amount from petitioner's gross income on the grounds that Dorothy neither was a bona fide resident of Zaire for the requisite periods nor earned and received the $25,000 claimed, or any other *179 amount, in Zaire during the taxable year. On brief, apparently conceding the bona fides of Dorothy's residence in Zaire under section 911, respondent argues only that petitioner has failed to show that $25,000 was reasonable compensation for Dorothy's services or that such amount was not paid to her at least in part in consideration of services rendered in prior years. On both counts, we disagree. *180 Beginning in early 1970, Harold and Dorothy made their principal residence in West Africa. During that year, Harold formed RDZ in Zaire, and hired Dimitri Kitsonidis as his business manager. Living conditions in Zaire during this period were difficult and there were periodic shortages of basic foodstuffs and services. Kitsonidis, who was responsible for payrolls, banking and other office administrative work, was compensated at an annual rate which reached the level of $50,000-$60,000, plus meals and lodging and certain other fringe benefits. When Kitsonidis unexpectedly left RDZ's employe in 1974, Dorothy, who had been working for RDZ in Zaire since 1970 without compensation, additionally assumed the majority of this duties. During 1974-1975, Dorothy, who spoke the Zairean language, Lingala, supervised RDZ's native employees, purchased food, assisted the employees in obtaining health care and arranging air travel, oversaw payrolls, and maintained RDZ's books or records. Since she lived in the staff house, Dorothy had to be prepared to meet these responsibilities virtually 24 hours a day. In Thomas' opinion, Dorothy's work for RDZ during this period was "invaluable. *181 " With the exception of a brief hiatus for her hospitalization in mid-1975, Dorothy remained in Zaire until her final return to the United States in 1976, where she remained until her death in December of 1976. Under section 911(c), as noted by respondent, the $25,000 paid to Dorothy during 1975 must be attributable to services actually rendered by her during 1974 and 1975 or it may not be excluded from gross income. In light of the foregoing facts, which are based upon the consistent, credible and unrefuted testimony of Harold, Ronald and Thomas on this issue, we have no difficulty in concluding that the $25,000 paid to Dorothy by HKCC in 1975 was reasonable compensation for her substantial services on behalf of RDZ during 1974-1975, and that the services so compensated were those performed during the approximate one-year period commencing with Kidsonidis' departure from RDZ in 1974 and ending with Dorothy's final return to the United States in 1975. Accordingly, such amount was properly excluded from the gross income reflected on Harold's joint return for 1975. To reflect the foregoing. Decisions will be entered under Rule 155.
Footnotes
1. On October 6, 1981, this Court granted respondent's motion to consolidate the following cases: H. Kalicak Construction Co. v. Commissioner, Docket No. 5030-81; Harold Kalicak v. Commissioner, Docket No. 5098-81; T. Thomas Heeter and Audrey Heeter v. Commissioner, Docket No. 5456-81. By our Order of December 5, 1983, Docket No. 5456-81 was severed from consolidation based upon the statement of the parties that a basis for disposition by settlement had been reached, and respondent's motion to consolidate with the remaining two cases, H. Kalicak Construction Co. v. Commissioner,↩ Docket No. 25040-81, was granted.
2. By stipulated agreement of the parties, the H. Kalicak Construction Co. is entitled to a net operating loss (NOL) carryback from 1978 to 1975 in the amount of $294,154. The parties have also stipulated that such portion of the 1978 NOL which is not used in 1975 will be carried to 1977. With the exception of the amount of the 1978 NOL to be carried to 1977, which will be determined as a result of our disposition of Docket No. 5030-81, the parties have settled all of the issues relative to Docket No. 25040-81.↩
3. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
4. Despite some vague testimony that Heeter was also involved in manufacturing certain other products, there is no credible evidence to substantiate this point.↩
5. With the exception of entries in HKCC's account, this record fails to disclose whether any of the subject payments were accompanied by formal indicia of debt, including interest or collateral. Since respondent has not challenged the existence of bona fide debt on this basis, however, we limit our determination herein to the sole basis upon which respondent relies; that is, the alleged absence of a reasonable expectation of repayment. In any event, we note that the absence of such formal indicia of debt would not necessarily obviate a finding of bona fide indebtedness herein. See Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court; Johnson v. Commissioner,T.C. Memo. 1977-436. Compare Gilbert v. Commissioner,74 T.C. 60, 66↩ (1980).
6. See also Silver Brand Clothes, Inc. v. Commissioner,T.C. Memo. 1972-60↩, and cases cited and discussed therein.
7. See Irbco Corp. V. Commissioner,T.C. Memo. 1966-67↩.
8. See Hudlow v. Commissioner,T.C. Memo. 1971-218↩.
9. This total reflects the sum of the entries in the exhibit for the first six months of 1970, less $400 for an entry described therein as "check voided."↩
10. To the extent that HKCC's claimed entitlement to an additional bad debt (or business expense) deduction is attributable to respondent's positive adjustment to its subject account in the amount of $852.81, such claim relates to an HKCC check to Heeter dated September 12, 1970, a date which is after the point when we have determined that HKCC could reasonably expect repayment, and is otherwise unexplained and unsupported on this record. We accordingly sustain respondent's determination to disallow this amount as a qualifying bad debt (or business expense) of HKCC.↩
11. Petitioner points to an averment in the Yocum petition that the defendants therein "dealt with the corporate assets of [Heeter] in a manner to defeat its creditors, namely, the transference of funds and assets of [Heeter] to other corporations in which the trustees had financial interests therein" [sic] as evidence of the potential liability of HKCC for the relief sought in such action. There is no evidence, however, that such "other corporations" included HKCC. Furthermore, even if it were intended that HKCC be so included, the corporation was not named as a party defendant, and there is no evidence that it could have been held liable in any event for any funds transferred in the manner alleged.↩
12. It is true that HKCC employed the electrical services of Redi-Electric Co., which was owned by John Frigerio's son, Al. There is no evidence, however, that Al knew of John's loan to Heeter. Moreover, even if he did know, there is no evidence to show how or why Redi-Electric Co. would have sought to hold HKCC accountable for Heeter's default.↩
13. In addressing the constructive dividend issue in Docket No. 5098-81, petitioner Harold suggests that the subject expenses were incurred by HKCC in defense of the same Finke and Yocum lawsuits which formed the basis for the corporation's claimed legal and professional expense deduction in 1973 (discussed in section (1) (b) of this Opinion). To the extent that the claimed expenses for 1975 might relate to such lawsuits, our holding as to 1973 has equal application here; to wit, there is no evidence that either lawsuit resulted from some action of HKCC relative to its ordinary business and there is no persuasive evidence that the results of either lawsuit would have adversely affected the reputation of HKCC, as distinguished from the reputations of Harold and Thomas.↩
14. In the event that any of the payments or sums in issue are determined to be corporate distributions to Harold, it should be noted that petitioner does not contest the fact that HKCC had sufficient earnings and profits to support characterization of such distributions as dividends under sec. 316(a).↩
15. See also Miller v. Commission,T.C. Memo. 1984-448; Lynch v. Commissioner,T.C. Memo. 1983-173↩.
16. See Thompson v. Commissioner,T.C. Memo. 1983-487↩.
17. In 1975, sec. 911 provided, in pertinent part, as follows: SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) General Rule. -- The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) Bona Fide Resident of Foreign Country. -- In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States * * * which constitue earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). * * * (c) Special Rules. -- For purposes of computing the amount excludable under subsection (a), the following rules shall apply: (1) Limitations on Amount of Exclusion. -- The amount excluded from the gross income of an individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of- * * * (B) $25,000 in the case of an individual who qualifies under subsection (a)(1), but only with respect to that portion of such taxable year occurring after such individual has been a bona fide resident of a foreign country or countries for an uninterrupted period of 3 consecutive years. (2) Attribution to Year in Which Services are Performed. -- For purpose of applying paragraph (1), amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed. * * * (4) Requirement As to Time of Receipt. -- No amount received after the close of the taxable year following the taxable year in which the services to which the amounts are attributable are performed may be excluded under subsection (a).↩